Corporation, Agent of Amtrak et al. Ms. Brown for the appellant, Mr. Charbaugh for the affiliates. May it please the court, we are here today asking that Ms. Ranowsky's case be remanded back for trial. We're asking the court to reverse the District Court's grant of summary judgment against Kathy Ranowsky. We believe the court ignored Ms. Ranowsky's evidence and made impermissible accreditation. What do you say he ignored? You used that same expression in your brief. What do you say he ignored? Well, he ignored, one, her excellent performance evaluations and her... Didn't he mention that in his statement? Well, what the court said in its opinion, if I may back up, is they relied on the fact that the court believed that Tom Howard consistently said that he was removing Ms. Ranowsky because of her performance. But in fact... But that doesn't say that he ignored evidence. I mean, it's rigorous. Well, he doesn't discuss the fact that just six weeks prior to her termination, he gave Ms. Ranowsky, he signed off on, not signed, I think we had an error in our brief, but signed off on Ms. Ranowsky's excellent performance evaluation. And he didn't make any mention of any loss of credibility with respect to her. In fact, he signed her 2013 performance evaluation. And notably, there was a meeting of Mr. Howard, Ms. Risch, and Mr. Warren that they attended to discuss Ms. Ranowsky's performance evaluation and her performance shortly before her termination. And Terry Gilmore could not recall any criticisms that there were of Kathy Ranowsky. The court did not discuss those items with respect to Ms. Ranowsky's termination or his position. In addition, the court ignored Colin Carrier's testimony regarding Ms. Ranowsky's performance, regarding the fact that she'd been recommended for a band increase. He ignored that she was significantly better qualified than the individuals who replaced her. He ignored that Amtrak refused to consider older applicants for the position. In fact, as if the court may recall, Frank Masaryk is the 35-year-old male who was selected for that position. He came out of the NASA IG office. His supervisor, Frank LaRocca, also applied for that position, and he wasn't even considered for an interview. That is combined with Terry Gilmore repeatedly asking Ms. Ranowsky when she would retire. There was an OIG internal assessment saying that OIG near retirement may not welcome changes. That wasn't heavily considered by the court. You'll find that in the joint appendix at 735. In addition, the court did mention succession planning. However, there was succession planning, and while we understand from the VanCleer case that that alone may not be sufficient to prove age discrimination, but combined with asking an applicant when they are going to retire, combined with the OIG assessment, combined with the replacement of two individuals, 25 and 35, and we have succession planning, then that is certainly evidence the court should have considered with respect to the age discrimination. In addition, it wasn't sufficient. The succession planning, was that the person who actually fired her? Was he engaged in that? The succession planning, yes, he would have been engaged in that. The succession planning would have been over the entire organization, but it's really Terry Gilmore who was the, I guess, architect, institutor of that, and he is one of the defendants who's named. And we have a number of positions that we're considering this morning before the court. One of them, and I would point the court back to the email. Let me back up for just one second. On the claims against Howard, who I understand is the one who actually fired her, is that right? He is the one who actually terminated her. Right. Was he involved in the succession planning? I thought that occurred before he even got there. Well, Terry Gilmore testified that they were actually in the process of completing the succession planning during that particular period. As the head IG, yes, he would have been a participant in that succession planning process, but they also had a third party, so everybody would have been involved in that, including Mr. Howard. Is there evidence that he was involved, other than that he would have been involved? Is there evidence, or do you just think it's likely? Well, I believe the OIG assessment, the 735, also discussed this conversation with Mr. Howard at that time period. And the last thing I'd like to mention, the court asked me what else the trial court ignored. So significant, we're looking at multiple positions here, not just the elimination of Ms. Renosky out of her position, but also the non-selection of her as to the two positions that she applied for subsequently. And Joint Appendix 1033, that, to remind the court, is the email where Mr. Gilmore and Mr. Winters are discussing the position description and say we've made changes to the position description in light of the litigation from the previous applicant. That wasn't fully discussed in the court's opinion. And more importantly, the request of Kathy Renosky as to when she would retire, combined with that email as to the position, it's clear it's direct evidence. I'm not sure why asking somebody when they plan to retire and doing succession planning is evidence of discrimination. Isn't that part of management to know all you can about what the future needs of your agency are going to be? Why is that evidence of discrimination? Asking someone when they're going to retire indicates that you have that person's age on your mind and it has been, and it is direct evidence. Well, you're supposed to not have it on your mind? I'm asking why it's evidence of discrimination. It seems just to be evidence of planning. There's no testimony. If you have people who are eligible for retirement on your staff, wouldn't it be irresponsible not to find out if they're planning to retire so you can do some succession planning? Well, I think the cases, including Vancouver, tell us that that question alone may not be enough. But combined with everything else, a question as to when someone's going to retire and then they're terminated and replaced with a 25- and a 35-year-old certainly would indicate that they had that person's age on their mind. Now, that was a temporary stopgap, right? Well, she remains at the company. She didn't remain in that position. Ultimately, Frank Masaryk was selected for the permanent position. That's correct, Your Honor. But they also, I mean, Amtrak pointed to Bailey as a replacement for Ranowski in defending the sex discrimination claim. So, I mean, functionally, they understand that she was a replacement immediately, functionally, for Ranowski, no? She was just a temporary replacement. She wasn't the long-term replacement for Ranowski. Right, so they're just supporting what you were saying, that she was put in the position to do the work in the immediate wake of Ranowski's departure. She was. And that's what Amtrak argued as well. That is what Amtrak argued. But now, one of the more significant pieces of testimony in this case is the affidavit of Renee Lee combined with that e-mail that I've mentioned before, the joint appendix at 1033. See, one of the things that we know is we have several different definitions from the defendants or several different attempted justifications to say why they believe Ms. Ranowski was terminated. Can you tell me again what the J site for the affidavit for Ms. Lee is? You will find Ms. Lee's affidavit, I believe it starts at 682 or 681 and goes through 685. That would be Ms. Lee's affidavit. Okay. So, as we know that the defendants were trying to cover their tracks and we've talked about who was moved into the positions. Ultimately, I would remind the court, Ms. Lee was not selected for the position. She's not a former employee. She voluntarily submitted a declaration in this case. And what she told us is that at the time that she was offered the position, it was significantly under what she would have expected. And she believed at the time that she found Terry Gilmore's behavior odd and suspected that they had pre-selected a less qualified candidate. Those were her thoughts as set on joint appendix page 682. And, in fact, they did hire Frank Masaryk at the same salary that was offered to Renee Lee. It was a $35,000 pay increase for him. Now, when we combine her test, her voluntary declaration in this case about the oddities as to her selection, combined with the email, joint appendix 1033, saying they were altering the position description in light of the previous applicant's litigation. What about when they came back to her for another $10,000, Ms. Lee? Well, actually what they did with Ms. Lee is when she asked about benefits and other items, they asked her to withdraw her application. That's what she found so odd. If they weren't going to select. No, I understand that. But then on paragraph 10, you raised the offer to $165,000. Tell me a little bit about that. Right, which is just $10,000 more than what they offered to Frank Masaryk, who had eight years of experience, whereas Ms. Lee had 30 and was already in a position far more significant than his. Do we know how much Amtrak is able to offer general counsel? We do. How much is that? We know that from the joint appendix 1033, where they discuss what the range of the position would be. And you'll find in that two-sentence email they discuss 120-150-180. That's what they were willing to offer at the time. And what are the three numbers? I didn't quite understand the dash, dash, dash. Well, I'm not sure it's significant other than knowing that 120 was the bottom of the range. And 180 was the top. Correct, Your Honor. And I would just like to mention as well. I'm sorry, how much was she making in her current job, Ms. Lee? I have to tell you, Your Honor, I'm not 100% sure exactly what her pay scale would have been, but inevitably what she said is that at $155,000 she viewed that as significantly under market, so under market that that would indicate to her that they had pre-selected another candidate. I understand that point. I'm trying to focus on what happens after she's offered the extra money. Does she say that that's also under market? Yes. And she declines the position. I'm sorry. Yes, she says that it was, but then they actually go back to her and they ask her would she withdraw her application. I believe that's 682. And she mentions it at page 8 that they ask her to send an e-mail. I'm sorry, this is 682, paragraph 8. They've asked her to send an e-mail saying, please send me your intention to withdraw from consideration of the position. She said, this e-mail appeared to support my suspicion that Amtrak OIG had already pre-selected a less qualified candidate and therefore was trying to force me to withdraw myself from consideration. So ultimately she didn't go forward with the position. Ms. Brown, what's your position on the relationship between the decision-makers? Because Amtrak makes quite a bit of emphasis on the fact that although Mr. Howard was the decision-maker in the termination that I believe it's Mr. Winters is then the person who takes the lead on hiring the replacement and is there evidence of communications or is it your position that Mr. Howard influenced Mr. Winters? Yes, he did influence Mr. Winters. One, we know from that e-mail again, 1033, that Mr. Winters is having a conversation with Terry Gilmore about the previous applicant and their selection. And then I would say, Your Honor, this is classic cat's paw, but if we look at the appendix at 1016, that's a voluntary separation document. It's the one that changed Ms. Ranowski from reduction in force to early retirement. And in that, she's marked as ineligible for rehire. So the reason that she's not rehired for the second position is because of the discriminatory removal and marking of her. I understood Amtrak to be, in your view, maybe a dispute, but I understood them to be saying, well, we were first trying to do a reduction in force so she'd be eligible for severance when she decided not to take that, and I gather that includes a waiver of any claims, right, the severance. Then she was eligible for a different benefits package, which is an early retirement benefits package. And one way or the other, if you're going to get those benefits, don't you have to be coded in a way that matches them? So it seems like there's sort of two different strata that are going on. One is the reasons, the actual reasons, and the other is treatment in terms of any kind of additional compensation at the end of her work with Amtrak. And those two things don't necessarily go to the same issue. I would say that they do. There's no testimony in this case that Ms. Ranowski had to be marked as a reduction in force in order to receive a severance. In fact, what we do know is while we have at least four shifting reasons why Ms. Ranowski was removed, it's our belief that the reduction in force was removed from this case even though, by the way, the district court contended that Tom Gilmore had consistently said that he lost confidence in Ms. Ranowski. I would point the court back to the joint appendix. I want to back up what you just said. I thought it was in the record that she got additional benefit if it went down as reduction in force rather than a full cost. It's what he says is a reduction in force kind of thing. There's nothing that says that she had to be labeled as a reduction in force in order to receive those benefits. If she were removed for cost, she didn't get the same benefit as reduction in force. I thought that was in the record. Am I wrong about that? Well, she wouldn't have been removed for cost even if she'd been taken out to go in a different direction. Even if you believe what they had proffered against her, there's no evidence that that would have been the cause that would have precluded her from severance. And I realize my time is almost up. I would just like to say again that we're shifting definitions or justifications for Ms. Ranowski. Let me ask you. I think we'll give you a little time for about a minute. Let me just ask you about the discovery issue. You know, the discovery, the rule does say that if the other side doesn't want to show up, they have to move for a protective order. On the other hand, there was this outstanding question of the quite substantial overbreath of the 30B6 notice. What in, you know, had the two sides conferred and really focused on what counsel for Ms. Ranowski really needed? What would that 30B6 deposition have focused on that really could have been the, you know, things that had not already been asked of others and not overbred? The policies of Amtrak, OIG, the policies of Amtrak. What policies? Not all policies. The policies relating to termination, the policies relating to severance, the policy relating to how Ms. Ranowski's termination should have been requested and handled between Amtrak and the OIG, a highly significant issue in this case. Of course, the point of having policies is to prevent one single decision maker's animus or discrimination against an employee from being carried out without checks and balances. We would have asked about the policies, the policies between the two of them, the terminations between the two of them, the documents required to remove Kathy Ranowski if there was a loss of confidence, documents. When you say between the two of them, you mean the Office of the Inspector General and the counsel's office? The Amtrak, Mother Amtrak, and then the Office of the Inspector General. Yes, I'm sorry, those are the two of them, including if there was going to be a removal of Kathy Ranowski, whether loss of confidence constitutes cause under their policies, whether additional. But she was an at-will employee, right? Well, she was an at-will employee, but there are policies that regulate how employees are to be removed. So yes, classically at-will. And you didn't have documents from document requests about what the policy, the employment policies are in the employee handbook? We had some policies, but we did move to compel before this court, and we did receive those after a lot of the depositions had already been taken. But there were severance policies that we did not have. There were a number of policies that we didn't have, and frankly that we would have wanted to ask questions on. And I'll just say very quickly, there's a question as to Terry Gilmore says that he classified her as a reduction in force in order to allow her to get severance. How the documents as far as her justification were handled between Amtrak and OIG, how that was to be requested, what the checks and balances were. That last point, could you just recap that, how it was handled between OIG and Amtrak? She had a termination letter prepared and then also a severance document. And so the question would be as far as having Amtrak oversee those, what were the policies as far as who should have prepared those and what justification should have been listed in that termination letter and in the severance agreement and what was required. So that's just a highlight of some of the items that we would have handled in the 30B-6. And I would just say it's not uncommon to get objections in the 30B-6. It doesn't mean that the 30B-6 doesn't appear. Lots of things can be worked out between the parties even during testimony. Although Amtrak's position was that they didn't even know, it was so broad and it was rather broad in several of the items. It was so broad that they weren't really sure who they could produce that would be responsive and how to prepare that individual as counsels require to prepare a 30B-6 deponent. I understand that argument. I would just say then they argue against themselves and say that they believe that individuals who already testified in this case could give that same testimony that we had asked for or that the individual fact witnesses had already testified with the corporate designee would testify to. So I don't think it's as unclear as they make it out to advance that particular point. And what about when Judge Harvey says are there any outstanding discovery concerns and nobody says that there were any? Well, actually, in the transcript I asked. I said if I had another issue, for example, if we had an issue that we thought might be a motion in limine, something that we were already discussing at that point, would I raise it with you or would that be raised with Judge Leon? And in the transcript he says that would not be raised with me. That would be raised with Judge Leon, and we did. We filed shortly after that on that exact issue. So I don't agree that we didn't say anything at that time or didn't indicate that that motion was coming. It's the only motion in limine that we have filed in this case. It's the only thing that we were thinking about at that particular time. And I would just note that Judge Harvey has a policy that the parties are to meet and confirm discovery issues prior to that time. So he made it very clear what he wanted to hear and what he did not. I literally asked that just to preserve that question and to see if it would come back to him. So I don't agree that we didn't raise it at that particular time. Thank you. Thank you. Good morning. May it please the Court. Matthew Sharbaugh on behalf of Appaluse. Your Honors, the district court in this case appropriately held that no reasonable jury could find that an appellant was the victim of intentional discrimination based on her age or based on her gender. To start with the discrimination claim, there are several key undisputed facts in the record that render that theory not viable. To start, there's no dispute that on the same day Ms. Ranowski was terminated by Inspector General Howard, he also terminated her male supervisor. That fact alone stands diametrically at odds with the notion that she was singled out based on her gender. Further, after Mr. Howard terminated both Ms. Ranowski and her male supervisor, he temporarily detailed a female Inspector General employee to assume some of the legal responsibilities in the Office of Counsel. And when Amtrak OIG went to permanently fill the Deputy Counsel position several months later, it's undisputed that they offered the position to a woman who declined the job. Confronted with these undisputed facts, no reasonable jury could find that Ms. Ranowski was the victim of intentional gender discrimination. The same is true with the age claim. There are several key undisputed facts in the record that render that theory illogical. It's undisputed that Mr. Howard, the sole decision-maker, is the same age as Ms. Ranowski. And the law necessarily followed that he couldn't have been discriminatory just because he's the same age. In other words, I'm positing the possibility that a person in that age might say, I really like to surround myself with young people. He could be just as discriminatory as the person who wasn't a young person. You're correct, Judge Sentelle. It's not a dispositive factor, certainly, but the law recognizes that it creates a very strong inference because most 62-year-olds don't discriminate against other 62-year-olds simply based on their age. And you add to that that the sole hiring decision that Mr. Howard made into the Office of Counsel after terminating both Ms. Ranowski and her supervisor was to hire Kevin Winters, who now occupies the general counsel role in the office, and he was 61 years old at the time. So, again, it belies logic to suggest that someone who's out to purge the office of 60-year-olds would then turn around and fill one of those vacancies with a 61-year-old. Instead, the evidence showed that Mr. Howard terminated Ms. Ranowski for the explanation he provided at the time and the explanation set forth today. So just to recap what you just said, your information, undisputed evidence, on why there was no age discrimination is that he hired Kevin Winters, who was 61, and? And that Mr. Howard himself is the same age as the appellant in the case, Judge Pillard. And to be clear, those aren't the only facts in the record, but those are sort of the key facts that I think have to be the starting point when we ask what a reasonable jury would look at here. We're at a point at which the plaintiff would have had the burden. You're right, Judge Sentell, exactly. And when you contrast that with what's been put forward in the record in this case, there's just nothing from which a reasonable jury could find. Why couldn't the reasonable jury have concluded from Ms. Lee's affidavit that the offer to her was not a real offer, but rather intended to allow you to make the argument you're making now with respect to gender discrimination? Chief Judge Garland, the record just doesn't bear that out. And even Ms. Lee's affidavit itself, we talked about it before, it's a joint appendix 681 to 85. She says in there that she was offered the position. She turned down the position that was offered to her by Mr. Winters. So we extended the offer to her once, we went back, we offered her more money, offered the job again, and she declined it. The second offer, by the way, is more money than Mr. Mazurek was offered when he came. He had less experience. He hadn't been an attorney as long, certainly, but he'd been working in the Office of Counsel for the NASA Inspector General, essentially doing the same job elsewhere. Although the announcement, I mean, in the government, when you advertise for someone with 10 years' experience, you can't hire someone with only 9 years of relevant experience. And he was someone who didn't formally meet the advertised qualifications. Isn't that right? I don't think we would agree with that, Judge Pillar. He'd worked in the Office of Counsel for the NASA IG for a decade. But wasn't there something in the record about his experience being not quite what was advertised? There's an argument that he didn't have the 10 years as an attorney in the office.  This Court has recognized that employers don't walk through a mechanistic checklist of the job application in all circumstances. Can you quibble over whether he was a little bit less qualified than her? Perhaps, but at the end of the day, the standard is, was Ms. Ranowski superiorly qualified so that it's inherently indicative of discrimination? And this record just doesn't support that inference. But again, we also have to come back to the fact that this is a discrimination case, and she's got to be able to put forward some evidence of age discrimination against these compelling facts in the record, which stand at odds with that notion. And for you, really, the main and most compelling argument is that the decision-maker and the individual who was brought in, Mr. Winters, were 60 or over, very close in age to Ms. Ranowski. Those are two of the most compelling facts that I think a jury would have to look at. There's other evidence in the record. But again, to Judge Centel's point, at that juncture it then turns to Ms. Ranowski to put forward a genuine dispute of material fact that would allow a finding of age discrimination on this record. No, we don't, though, require direct evidence in every discrimination case. You don't have to have evidence of discrimination in the sense that it leaps off the page. Circumstantial evidence suffices. What about the performance evaluation? I found it really striking that she had gotten an Exceeds Expectation performance evaluation so recently before. And is there anything in the record suggesting that anybody had counseled Ms. Ranowski to improve her communication or her attitude or helpfulness? Anything? So you're correct that direct evidence is not required, certainly. I've asked you three questions. Circumstantial evidence suffices. I'm going to try to take them in order. As to your second point, you're correct that there is evidence in the record that Mr. Howard would have signed off on her performance evaluation. That's all we have. She was given this very positive feedback. By a different person who was her supervisor, Mr. Carrier, who Mr. Howard terminated on the same day based on a loss of performance. He might have gotten a raw deal, too, but by her employer. I mean, what this woman is hearing is everything's going great. Again, I think... So that takes me to my next question. Is there anything in the record where anybody said, hey, you know, we're under a whole kind of reorganization, we're rethinking things, and among the things we think we need to do is have a more can-do attitude? And there's been some question about that with you. Anything at all? There is evidence in the record that she had issues before this decision came to pass. Dave Warren, who was the assistant inspector general for audits at the time, his testimony is in the record at Joint Appendix 376 to 78 and probably some of the surrounding pages. But he had issues with Ms. Ranowski. He approached her prior supervisor about it. She was counseled about those issues. But again, at the end of the day, that was Mr. Carrier's evaluation, not Mr. Howard's. And Mr. Howard, as a new inspector general, came in and was entitled to his own assessment. And when you look at the other documentary evidence in the record from Mr. Howard, there are issues shown in the record. There's an email in the record at Joint Appendix 924. This is an exchange about a redaction issue, I believe, for a report that was going over to Congress. Ms. Ranowski referred to the inspector general's question as foolish in the email, and he forwarded it on to the assistant inspector general for investigations, Ms. Risch, and said, please handle this. I can't deal with this useless dialogue anymore. So there is other evidence in the record. And on top of that, you don't just have to take Mr. Howard's word for it because the other top officials in the office, Mr. Warren and Ms. Risch, shared concerns with him at the time, and they echoed those concerns and discovery in this case. And those deposition pages are in the record. Which is the page where you say Mr. Warren said that she was counseled? Yeah, I was also looking for that. You told a prior? Mr. Warren's testimony, I can get the exact page. It should be near Joint Appendix 376 to 78. What is it he said about the counseling? He approached Ms. Ranowski's prior boss, Mr. Carrier, with a concern about the way she'd been interacting with him. And the testimony, I believe, I don't have it in front of me, is that he understood that Mr. Carrier spoke with Ms. Ranowski about that issue. But, again, we have to remember that Mr. Howard is coming into this as a new Inspector General. He's entitled to his own assessment. He's now the boss of the office. And, you know, I think the other thing that's important when we think about this case is that we're not talking about someone who makes widgets, right, who's supposed to make ten widgets a day, and they are only making five, and let's performance manage this person back to square one. This is a very sensitive position in a very sensitive office that was created by Congress, and it's incumbent on someone in that position to demonstrate confidence and sound judgment in the eyes of the leader of that office. I understand that for sure, Mr. Chauvin. I don't think anybody would question Amtrak's prerogative to have in place legal counsel in whom it has utmost confidence. It is also, however, common and has been for decades that one of the ways that discrimination occurs is that somebody, you know, the young African-American attorney, the woman, the woman in her mid-career, is told everything's going great, great, great, and to the extent that people are unhappy, they're not engaging, they're not supervising, they're working around that person, and then they say to that person one fine day, thank you, we no longer need your services, or thank you, we don't expect you to make a partner, without any kind of feedback or opportunity to fix it. And part of that is somehow the assumption that this person is unable to fix it, is unable to meet the demands of the office. So that itself is actually a very common piece of evidence of discrimination, is the kind of, you know, everybody's sailing full sails according to the employee, and then the next day the door is shut in her face. And so, you know, I understand your position is, well, it may look like a raw deal, but it's not discrimination. That's exactly right, though, Judge. I mean, well, I don't agree that it's a raw deal. I think the record in the case bears out that there were issues, that Mr. Howard's concern was legitimate and held in good faith, and that's the standard here, right? But were they communicated to Ms. Ranowski, and was she given an opportunity to step up and respond? That's the question I have, and I think that's why we were both looking in the deposition and trying to find evidence that she was counseled. And maybe then it's in some of the deposition pages that were not provided to us, but what we have is various people talking among themselves. She's kind of cranky or, you know, whatever I'm characterizing, but, you know, people saying, well, I found her a little bit difficult to deal with. And what I'm looking for is evidence that anybody went to her and alerted her, A, to actually support the notion that people really did take this that seriously, but B, that they acted with her as if she was someone who was able to respond if fairly dealt with. Judge Pillard, again, the record bears out that, at least in one instance that I can think of standing here, Mr. Warren had an interpersonal issue with her and went to her prior boss about it. At the end of the day, is there an argument that she could have been provided with more counseling? Perhaps. Any counseling. However. Any counseling. But this is not a situation where we're second-guessing, you know, did Amtrak make the wisest decision? This is a case of intentional discrimination. This would be the follow-up question I would have. This is a discrimination case. Is there any evidence that she was treated any differently with regard to further counseling than any other employee of any age? No, Judge Sentel, there's not. And, in fact, her male supervisor was terminated on the same day as her. No evidence that he had counseling either. That's exactly right, Judge. I do want to touch briefly on the discovery dispute because there were some questions about that below and when my counterpart was up here. I think you picked up on the point here, which is that this was not some sort of effort to stonewall discovery on the part of my clients in this case. Well, I'm interested in the question of why no protective order. So the local rule says seven days' notice. There was seven days' notice. They noticed that last day. I've been in this situation. That's a bad thing. I would immediately go to the judge or the magistrate and ask for a protective order, and they would immediately grant it. Somebody waits until the very last day, okay, but you didn't do that. We cooperatively worked and really in good faith tried to find some narrow topics on which we could produce someone. And I hope that the record bears that out. I was the one who engaged in both of those efforts. Why didn't you go to the judge? Frankly, Judge Sentel, we were before Judge Harvey for a discovery hearing, as was already discussed. He asked if there were any other issues, and she said that it wasn't brought up at the time. So I frankly thought that the issue was dead at that point. Except for the motion in limine, and she said that was the only in limine issue pending between the parties. Nothing was pending at that point, Judge Pillard. The only outstanding issue. If there were some ambiguity about what he meant, a quick question would have surely clarified. Because at that point, the burden's on you under Rule 37. If there's a deposition notice, you have to show up. And if you have a problem with the scope of it or the nature of it or some privilege that you think it's going to inquire into, burden's on you. So I think under the rules, maybe she was playing hardball, but presumably you or whoever was handling this below has done employment cases before and knows one of the standard things that someone would want in an employment case is to question somebody knowledgeable at Amtrak about documents that, as she says, they didn't receive until after the other deponent's already been deposed. I mean, this question about progressive discipline, about what kind of notice, what kind of counseling is ordinarily given, about how other people who have been fired have been treated, that's pretty critical if you are a plaintiff and have the burden of proof in an employment case, is it not? Judge Pillard, the appellant had the opportunity to develop all that evidence. They took 11 depositions. They deposed everyone in the Amtrak IG counsel's office. They had the people, and they asked the questions, and they had the opportunity to do it. That's one of the problems with the notice. The document is timely provided, according to Ms. Brown. I guess the broader issue here is, you know, if we were here on a review of a motion to, you know, compel or something, then I think these arguments would be potentially a little bit more meritorious. But we're standing here on a denial of a motion for sanctions that sought evidence preclusion that would have prevented our clients from effectively testifying on their defense. But there's no reasoning provided by the judge. I mean, if that were the ground that the judge said, I take it your argument is the judge could have said no because the only sanction they sought was all this preclusion. Of course, there are other sanctions available, but that was the only one they thought. But the judge didn't say that was the reason. We don't know what the reason was. I think you're right. That is the point, that this was this sort of they went right to the maximum dial sanction here when this Court's case law clearly says that that's not warranted unless other sanctions weren't warranted. But the judge didn't say that was the reason. This Court has said that in cases where the reasoning is evident from the record, the cases part of Croneman v. Donovan, that you don't need to rely on a fulsome explication from the district judge. And I think here that fact – The difference between fulsome and noesome. In this case, it's noesome. Judge Garland, our position is that given the nature of the sanctions sought and the way that this was approached by appellant below and the fully developed record that the Court was well within its discretion to deny the motion for sanctions. Further questions? Thank you. We request that the Court affirm the district court. Thank you. Is there time left? I think we've indicated we'll give you another minute or two. Your Honor, I would just like to come back briefly to Renee Lee's declaration. That's Joint Appendix 685, paragraph 14. In there, Ms. Lee says that she was never given a formal offer. And in her view, they could have simply offered the job to another candidate without it being necessary for her to withdraw herself. But she says there that she did not get a higher salary. She knew higher salaries were required. And this combined with the shifting justifications that we've received. I thought she was offered that. She says, I have never been given a formal offer. What she discusses in here is that there was money, there was discussion about benefits. Mr. Winters told her that the benefits weren't going to be as good as what she currently had. She said she wanted to make that decision. But no formal offer. Even without a formal offer, if somebody says it's not really worth going down that road because the money's not enough, that's not irregular to say, well, okay, let's not spend further time on this. I thought the reference to the formal offer was before the offer of 165. In paragraph 15, she said, withdraw myself from consideration when I had never been given a formal offer. Right, wasn't the withdraw myself from consideration asked after she turned down the 155? I believe you may be correct, Your Honor, yes, that it was with the 155. I would just note, Your Honor, as to paragraph 12, she said she had lots of reasons for accepting an offer, including that her office was moving the location, lots of other considerations for her beyond just the amount. That combined with the shifting designations and then keeping in mind it was Tom Howard himself who filed an answer in this court saying Ms. Ranowski was eliminated as part of a RIF. It certainly shows that there was an attempt to cover up or hide behavior, and Reeves v. Sanderson Plumbing tells us that's indicative of discrimination. There is an inference that hiring a younger employee can be discrimination. So there's two inferences, one of the older worker, one of hiring the younger workers. No, and Mr. Howard never took issue with the 2014 review. No indication whatsoever, no single document that Ms. Ranowski had any performance issue. So I would just indicate from that perspective, this case warrants a trial by Ms. Ranowski's peers. We would ask that the case be remanded for trial and also that the court's decision on the motion in Lemonade be reversed. Thank you, Your Honor. Thank you both. We'll take matter under submission.
judges: Garland, Pillard, Sentelle